

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 OCT 14 AM 11:10

CLERK

BY ~~LAW~~
~~DEPUTY CLERK~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MadGrip Holdings, LLC, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> West Chester Holdings, Inc., an Ohio corporation, <br><br> Defendant. | Civil Action No. _____ <br> 2:16-CV-272 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff MadGrip Holdings, LLC ("MadGrip") files this complaint against Defendant West Chester Holdings, Inc. ("West Chester") and hereby alleges and states as follows:

### PARTIES

1. MadGrip is a Delaware corporation registered as a foreign limited liability company in Vermont. MadGrip's principal place of business is 6 Thompson Dr., Essex Jct, VT, 05452.

2. Upon information and belief, Defendant West Chester is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

### JURISDICTION AND VENUE

3. This is a civil action for patent infringement arising under the patent laws of the United States of America, 35 U.S.C. § 1, *et seq*.

4. This Court has jurisdiction over the subject matter of the Complaint pursuant to 28 U.S.C. §§ 1331, 1338 & 1367.

1

5.      The Court has personal jurisdiction over West Chester because West Chester sells, offers for sale, or imports products made by an infringing method into the stream of commerce in this jurisdiction. Defendant has and continues to offer for sale, import, and/or sell products that are made by a method that infringes MadGrip's patent rights in the State of Vermont and elsewhere throughout the United States.

6.      This Court's exercise of personal jurisdiction over Defendant is consistent with the Constitutions of the United States and the State of Vermont.

7.      MadGrip has its headquarters and principal place of business in the State of Vermont.

8.      Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) and 1400(b) because Defendant has and continues to offer for sale, import, and/or sell products that are made by a method that infringes MadGrip's patent rights in the State of Vermont.

## BACKGROUND

9.      MadGrip is an innovative glove company located in Essex Junction, Vermont. Through its novel and patented innovations in utility glove manufacturing, and through its use of its patented technology, MadGrip is fast becoming a major player in the utility glove market.

10.     Utility Gloves come in a variety of configurations. Utility gloves generally provide the wearer with added grip and/or protection when worn. Utility gloves are used for many activities, such as working on cars, unloading cargo from trucks, or operating tools or machinery.

11.     In 2006 or 2007 David Gellis, one of the principals of MadGrip, realized that the gloves currently being sold in the utility glove market did not meet the needs of many consumers.

12. In particular, Mr. Gellis realized that utility gloves made using technical "cut and sew" techniques (an example of which is shown below) were vulnerable to abrasion and tearing. As a result, these gloves need to be replaced more often.



13. "Cut and sew" gloves can also be expensive. The manufacturing process involved in assembling "cut and sew" gloves is labor intensive. The labor intensive nature of "cut and sew" glove manufacturing is only increased when additional technical features are added to the gloves—such as impact protection, and/or palm reinforcement, which increases the cost of the glove.

14. A second type of glove that existed in the utility glove marked was so-called "dipped gloves" (see image below). "Dipped gloves" typically include a "gripping" area which is created by dipping a, usually nylon, glove into a rubber compound. *See* Exhibit A (U.S. Patent No. 9,346,202), 1:21–35. This method of manufacturing utility gloves is also imperfect because the dipping process increases the density of the glove and maintains a fabric portion which tends to absorb moisture and dirt, making it difficult to clean. *Id.* While such "dipped

3

gloves" may be created cost effectively (due to the automated manufacturing process), in contrast to the "cut and sew" gloves, the "dipped gloves" are not nearly as flexible, or as customizable as the "cut and sew" gloves.



15. Based on these facts and the then-existing utility glove market, David Gellis sought to develop a solution for a new glove that was cost effective to manufacture, more like the "dipped gloves," but that had increased flexibility and other similar advantages, like that of "cut and sew" gloves.

16. In response to the problem identified, Mr. Gellis came up with and patented MadGrip's injection molded glove technology.

17. Specifically designed for maximum grip for the hard working and/or hard playing individual, the technology can be used in place of standard utility gloves in almost any field, including automotive, construction, yard work, action sports, package handling, plumbing and precision handling of small parts.

18. The MadGrip injection molded glove technology is further contoured with the natural contours of the wearer's hand to allow for maximum motion while still providing a cushion to the wearer's palm. An example of the MadGrip

4

injection molded glove technology along with some of its benefits are shown below, as embodied in MadGrip's Thunderdome and Pro Palm Utility gloves.



19. On July 16, 2007, Mr. Gellis filed a provisional patent application for MadGrip describing the new manufacturing technique he had devised.

20. On May 24, 2016 the United States Patent and Trademark Office granted MadGrip a patent covering its new utility glove manufacturing methods ("MadGrip Technology")—United States Patent No. 9,346,202. (The "'202 Patent" attached hereto as Exhibit A.)

21. Mr. Gellis, the sole named inventor, assigned an undivided interest in the invention to Mr. Phil Gellis and both Mr. David Gellis and Mr. Phil Gellis

assigned all right, title, and interest in the invention described in the '202 Patent to MadGrip.

22.     MadGrip currently sells MadGrip gloves in the United States which are made according to the methods taught in the '202 Patent.

23.     The '202 Patent claims a variety of methods of manufacturing utility gloves using injection molding instead of dipping the gloves in a rubber material.

24.     Representative Claim 1 of the '202 Patent reads:

> 1. A method of manufacturing a utility glove utility [sic] having a thumb and four fingers, said glove comprising a three dimensional molded portion, the molded portion comprising an elastomeric material bonded to a fabric material in a three dimensional configuration substantially conforming to three dimensional contours of at least a portion of a hand exclusive of any variations in thickness or features on the surface of the molded portion, comprising the steps of:
>
> a. placing a glove blank comprising a fabric material over a first mold part in the form of at least a portion of a hand;
>
> b. bringing at least a second mold part into molding engagement with the first mold part to create a cavity with the glove blank on the first mold part; and
>
> c. injecting an elastomeric material into the cavity to form the molded portion, wherein the elastomeric material is injected on the side of the fabric material opposite the first mold part, said molded portion comprising greater than 50% of the circumference of each of the fingers along the length of each finger while leaving an area of fabric without elastomeric material on each finger wherein the molded portion comprises a palm having a middle and edges, the palm edges comprising a heel, a front corresponding to knuckles of the fingers, a thumb side and an outer side, wherein the middle of the palm is set in from the heel, the front, the thumb side and the outer side of the palm to form a concave shape.

25.  Representative Figures 9 and 10 of the '202 Patent demonstrate an embodiment of a glove produced according to the claimed methods of the '202 Patent:



FIG. 9  FIG. 10

26.  The benefits of the new gloves were immediately recognized by the industry when MadGrip began marketing its gloves made according to the methods of the '202 Patent at trade shows beginning in 2010.

27.  The MadGrip Technology drew interest from a number of reputable glove manufacturers and/or distributors. *See* Nov. 15, 2015 Declaration of Phil Gellis (attached hereto as Exhibit B).

28.  One such company was Ansell Protective Products, a world leader in the sale of hand protection equipment directed to health and safety solutions, which resulted in a distribution and development agreement between Ansell Protective

7

Products and MadGrip. The agreement included a license for Ansell to sell gloves manufactured by MadGrip in accordance with the MadGrip Technology described and claimed in the '202 Patent outside of the United States and Canada.

29. MadGrip continues to be approached by numerous competitors seeking distribution and/or license agreements to produce gloves which practice the MadGrip Technology claimed in the '202 Patent.

30. MadGrip's customers also have expressed widespread satisfaction with MadGrip's gloves made using the MadGrip Technology, one such example is shown below.

★★★★★ **Fantastic Gloves For All Work**, May 8, 2012
By **The Bookster**
This review is from: **Mad Grip F100 Pro Palm Knuckler Gloves (Sports Apparel)**
I purchased these gloves over the winter at a local TJ Maxx where they were on sale and it's now time for a review. I've done everything from demolitions to tree removal and landscaping with them and they haven't given me any problems. No tearing, no splitting and best of all no blisters or splinters. They certainly call them "Mad Grip" for a reason. Regardless of what you're doing they will give you a nonslip grip that makes moving furniture or other objects much easier. The best part about these gloves is that they are comfortable. Because they are injection molded instead of dipped, the fingers and palms have a little extra padding for comfort. Definitely a 5 star product!

Help other customers find the most helpful reviews    Report abuse  Permalink
Was this review helpful to you?  [ Yes ]  [ No ]

## DEFENDANT

31. The Defendant West Chester manufactures and sells a set of gloves under the Sumo Grip trademark. The gloves are shown below:



32. These gloves can be purchased from any number of retailers including Amazon[1], Walmart[2], and Ebay[3].

33. During September 2016, MadGrip purchased a pair of these Sumo Grip gloves through Walmart's website. The gloves were shipped directly to MadGrip's headquarters in Vermont.

34. West Chester has and is currently manufacturing, causing to be manufactured, importing, selling, and/or offering for sale these Sumo Grip gloves in Vermont and throughout the United States.

35. West Chester's advertisements prominently highlight that the gloves are made through an injection molding process, as shown, for example, on the cardboard hangtag the Sumo Grip gloves are sold on:

---

[1] https://www.amazon.com/West-Chester-Sumo-Grip/dp/B01CVESI9W (last visited Oct. 4, 2016).
[2] https://www.walmart.com/ip/West-Chester-Protective-Gear-Sumo-Grip-Coated-Glove/110618104 (last visited Oct. 4, 2016).
[3] http://www.ebay.com/itm/West-Chester-Protective-Gear-Sumo-Grip-Glove-/201647358428 (last visited Oct. 4, 2016).

9



36. It also advertises this feature in its online advertising, such as in West Chester's Amazon.com listing:



*See* note 1 (annotation added).

37. As detailed below, upon information and belief, and as confirmed in its advertising, the West Chester Sumo Grip gloves were manufactured via a process which infringes at least claim 1 of MadGrip's '202 Patent.

10

38.     Injection molding requires molds that are made into different shapes, such that a material can be injected into the cavity within the mold(s), which results in the injected material bonding with another material, and/or taking the form created by the molds. In the case of a glove, MadGrip's '202 Patent teaches a first mold part in the form of a hand that the fabric glove blank can be placed on to form its shape. A second mold part is then placed in proximity to the first mold, leaving a cavity where the elastomeric material can be injected into and then bond to the fabric of the glove blank. West Chester's Sumo Grip gloves advertise they are formed from this injection molding process.

39.     Claim 1 of the '202 Patent also requires that specific elements be present in the molding on the glove resulting from the injection molding process. In this case, all of the elements recited in claim 1 of MadGrip's '202 Patent are present in the Sumo Grip gloves. In particular, the molded portion of the Sumo Grip glove is greater than 50% of the circumference of each finger, and it includes a palm with a middle and edges, the palm edges comprising a heel, a front corresponding to knuckles of the fingers, a thumb side and an outer side, and the middle of the palm is set in from the edges of the palm to form a concave shape. A complete mapping of the claim limitations of representative claim 1 of the '202 Patent to the infringing Sumo Grip gloves is shown below.

40.     Upon information and belief, as described above and as shown below, the Sumo Glove infringes at least Claims 1–5, 7–10 and 13 of the '202 Patent.



41. To confirm that the gloves were indeed manufactured using an injection molding process, and not just advertised as such, MadGrip purchased and analyzed the Sumo Grip gloves.

42. MadGrip also reached out to West Chester and on or about May 18, 2016, when counsel for MadGrip contacted West Chester to inform them that the '202 Patent would issue on May 24, 2016 and that West Chester would then likely be infringing the '202 Patent. MadGrip therefore requested information about West Chester's manufacturing process to confirm that the Sumo Grip gloves were being manufactured by an injection molding process as advertised, and as suspected by MadGrip based upon its inspection of the gloves.

43. Over the course of several months, attorneys for MadGrip and West Chester exchanged correspondence regarding West Chester's infringement.

12

During this time, MadGrip specifically and repeatedly asked for information and confirmation of West Chester's manufacturing process as advertised for its Sumo Grip gloves.

44. West Chester, however, refused to share any details regarding its injection molding manufacturing process. Tellingly, in its correspondence it did not deny that it is using the injection molding process alleged by MadGrip, and as advertised on its Sumo Grip gloves.

45. In any event, despite MadGrip's repeated requests, West Chester has been unwilling to stop making, using, importing, selling or offering to sell its Sumo Grip gloves made using a process that infringes claims of the '202 Patent.

46. West Chester in not licensed to practice the '202 Patent, and West Chester has no right or authority to practice or license others to practice the '202 Patent.

47. MadGrip and West Chester are direct competitors in the utility glove market. MadGrip's utility gloves are sold at some of the same retailers as West Chester's infringing gloves, such as Amazon and Walmart.

## COUNT I
### (Infringement of the '202 Patent)

48. MadGrip repeats and re-alleges the allegations in preceding paragraphs 1–48, as if fully set forth herein.

49. This is a cause of action pursuant to 35 U.S.C. § 271, *et seq.* for infringement of the '202 Patent.

50. West Chester has been and is now engaged in activities that infringe the '202 Patent by making, using, importing, selling, and/or offering for sale Sumo Grip gloves which are manufactured by a method disclosed and claimed in the '202 Patent in violation of 35 U.S.C. § 271, *et seq.*

51. West Chester's acts have been and are now being done willfully with knowledge of or reason to know that they constitute infringement of the '202 Patent.

52. West Chester has had knowledge of the '202 Patent since at least May 18, 2016 when MadGrip informed West Chester that the '202 Patent would issue on May 24, 2016.

53. Upon information and belief, West Chester has been infringing the '202 Patent by making, using, selling, importing, and/or offering for sale gloves made by an infringing process in this district and elsewhere in the United States.

54. MadGrip has suffered and will continue to suffer irreparable harm, damage, and injury by reason of the complained of acts for which Plaintiffs have no adequate remedy at law.

55. As a direct and proximate result of West Chesters' acts of patent infringement, MadGrip have been and continue to be injured, and have sustained and will continue to sustain substantial damages in an amount not presently known.

56. MadGrip is entitled to recover compensatory damages as a result of West Chester's infringement under 35 U.S.C. § 284, including a reasonable royalty and/or lost profits.

57. Due to West Chester's willful infringement and the particular circumstances of this case, MadGrip is entitled to recover enhanced damages under 35 U.S.C. § 284, including treble damages.

58. Due to West Chester's willful infringement and the exceptional nature of this case, MadGrip is entitled to recover attorneys' fees under 35 U.S.C. § 285.

59. Because West Chester had actual notice of the '202 patent as well as the issued claim at least as early as May 18, 2016, prior to the '202 Patent's issuance, MadGrip is entitled to pre-issuance damages under 35 U.S.C. § 154(d)

## PRAYER FOR RELIEF

WHEREFORE, MadGrip prays that judgment be entered by this Court in its favor and against West Chester as follows:

    a.    That West Chester, and all other persons, firms, or corporations acting in concert or participation with them, be enjoined and restrained, during the pendency of this action and permanently thereafter, from making, using, importing, offering for sale, or selling any and all goods which were manufactured in a manner which infringes the '202 Patent;

    b.    That MadGrip recover damages sustained, including lost profits and/or a reasonable royalty, as a result of West Chester's infringement of the '202 Patent, pursuant to 35 U.S.C. § 284;

    c.    That West Chester's infringement be adjudged to be willful, its infringing conduct adjudged egregious, and that MadGrip's damages be trebled or otherwise enhanced, pursuant to 35 U.S.C. § 284;

    d.    That West Chester's infringement be adjudged to be willful and this case declared exceptional, and that MadGrip recover its reasonable costs, expenses, and attorney fees, pursuant to 35 U.S.C. § 285;

    e.    That the Court hold that West Chester had actual notice of the '202 patent as well as the issued claim at least as early as May 18, 2016, prior to the '202 Patent's issuance, and that MadGrip is entitled to pre-issuance damages under 35 U.S.C. § 154(d); and

    f.    MadGrip be granted such other and further relief as the Court may deem just and proper.

QB\41677890.11

## DEMAND FOR JURY TRIAL

Plaintiff MadGrip hereby demands a jury trial as to all issues that are so triable.

Respectfully submitted,

Dated: October 12, 2016

LANGROCK SPERRY & WOOL, LLP

*/s/ Wanda Otero-Weaver*

Wanda Otero-Weaver, Esq.
111 South Pleasant Street
PO Drawer 351
Middlebury, VT 05753-0351
Email: wotero@langrock.com
Ph: (802) 388-6356 | Fx: (802) 388-6356

Gregory P. Sitrick *(to seek admission pro hac vice)*
Isaac S. Crum *(to seek admission pro hac vice)*
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004-2391
Email: Gregory.sitrick@quarles.com
Email: Isaac.Crum@quarles.com
Ph: (602) 229-5317 | Fx: (602) 420-5198

Attorney for Plaintiff MadGrip Holdings, LLC